IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

ANTHONY J. DIVALENTINO,           :        No. 3:24-CV-0030
            Petitioner            :
                                  :        (Judge Munley)
    v.                            :
                                  :
COMMONWEALTH OF                   :
PENNSYLVANIA,                     :
            Respondent            :

## MEMORANDUM

Anthony J. DiValentino initiated the above-captioned action by filing a *pro se* petition for a writ of habeas corpus pursuant to 28 U.S.C. § 2254. He challenges his 2016 convictions and sentence entered by the Court of Common Pleas of Monroe County, Pennsylvania. After careful consideration, the court will deny DiValentino's Section 2254 petition.

## I.    BACKGROUND

A detailed factual and procedural background in this case has been aptly summarized by the Superior Court of Pennsylvania:

> On March 21, 2010, police responded to a domestic incident involving DiValentino and his paramour, Ann Marie Andrews. Police subsequently arrested DiValentino and charged him with simple assault; he spent a short time in jail before posting bail. From the day of the assault until April 21, 2010, DiValentino continuously made threatening phone calls to Andrews in an attempt to intimidate and prevent her from testifying at his preliminary hearing for simple assault. On April 22, 2010, the morning of DiValentino's preliminary hearing, Andrews awoke to DiValentino pressing the barrel of a gun to her back.

DiValentino held Andrews hostage, threatened her so she would not testify at his preliminary hearing, and stated he test-fired the gun into a pillow to ensure no one would hear his firearm discharge if he shot her. After approximately an hour, at Andrews' request, DiValentino released her so that she could take her daughter to the school bus stop. Andrews dropped her daughter off at the bus stop and proceeded directly to the police. Later that day, police arrested DiValentino and charged him with kidnapping, intimidation of a witness[,] and related offenses. On April 26, 2010, Andrews was granted a three-year protection from abuse ("PFA") order against DiValentino. On June 10, 2010, DiValentino waived his right to a preliminary hearing in exchange for reduced bail, and he was released on bail on the condition he not contact Andrews.

On June 14, 2010, while Andrews was driving to work on Interstate 84 ("I-84") in New York State, DiValentino used his vehicle to run Andrews off the road. DiValentino caused a serious crash that injured Andrews and required emergency response personnel to extricate her from her vehicle with the Jaws of Life. DiValentino fled the scene and attempted to commit suicide, but New York State police apprehended him before his self-inflicted wounds proved fatal. New York State police later charged DiValentino with attempted murder and related offenses stemming from the I-84 incident. DiValentino remained incarcerated in New York State while awaiting trial both there and in Pennsylvania.

Sometime between December 2010 and January 2011, DiValentino conspired with a fellow inmate to murder or hire someone to murder Andrews. He provided the inmate with maps to Andrews' home, diagrams of the home, personal information about Andrews and her daughter, the home's garage code, details about the home's alarm system, and Andrews' daughter's school schedule. Unbeknownst to DiValentino, the inmate was a police informant who agreed to wear a wire during their conversations. On February 10, 2011, a grand jury indicted DiValentino for conspiracy and solicitation to commit murder.
. . .

[O]n September 11, 2015, DiValentino waived extradition. By then, the New York Supreme Court had convicted DiValentino of attempted murder and related charges.

2

DiValentino's Pennsylvania trial commenced on June 21, 2016, and concluded on June 23, 2016. A jury convicted DiValentino of [two counts of harassment, two counts of kidnapping, two counts of retaliation against a witness, two counts of simple assault, coercion/threat to commit a crime, false imprisonment, intimidation of a witness, stalking, terroristic threats, and unlawful restraint]. On August 30, 2016, the trial court sentenced DiValentino to an aggregate term of 150 to 300 months' incarceration to be served consecutive to his New York State sentence. The trial court applied the deadly weapon enhancement to DiValentino's sentence, pursuant to 42 Pa.C.S.A. § 9712 but, notably, the jury did not find DiValentino guilty of possession of an instrument of crime ("PIC").

Commonwealth v. DiValentino, Nos. 787 EDA 2017, 788 EDA 2017, 2018 WL 3827259, at *1-2 (Pa. Super. Ct. Aug. 13, 2018) (nonprecedential).

After the trial court denied DiValentino's post-sentence motions, he appealed, raising four challenges to his convictions. See id., at *2.[1] The Superior Court of Pennsylvania rejected Divalentino's claims and affirmed his judgment of sentence. See id., at *1, *8. On February 13, 2019, the Supreme Court of Pennsylvania denied DiValentino's petition for allowance of appeal. Commonwealth v. DiValentino, Nos. 578 MAL 2018, 579 MAL 2018, 202 A.3d 39 (Pa. 2019) (table).

On November 25, 2019, DiValentino timely filed a pro se petition under Pennsylvania's Post Conviction Relief Act (PCRA), 42 PA. CONS. STAT. § 9541 et

---

[1] DiValentino also challenged the legality of his sentence under Alleyne v. United States, 570 U.S. 99 (2013). See DiValentino, Nos. 787 EDA 2017, 788 EDA 2017, 2018 WL 3827259, at *6. That claim was likewise denied. See id., at *6-7.

3

*seq.*, raising 15 grounds for relief.  See Commonwealth v. DiValentino, No. 1007 EDA 2022, 2023 WL 367025, at *2 (Pa. Super. Ct. Jan. 24, 2023) (nonprecedential).  PCRA counsel was appointed, but DiValentino and his attorney disagreed about which issues should be argued during PCRA proceedings.  Id.  The PCRA court granted counsel's motion to withdraw and appointed substitute counsel.  Id.

DiValentino eventually raised three post-conviction grounds for relief in the PCRA court.  Id.  The PCRA court granted DiValentino's claim regarding amending his harassment sentences from flat 90-day terms to indefinite terms of 45 to 90 days' incarceration.  Id.  It likewise granted DiValentino's claim that he was entitled to additional time served.  Id.  The PCRA court rejected DiValentino's final claim seeking a new trial based on the Pennsylvania jury being provided with photographs from the New York State I-84 incident during its deliberations.  Id.

DiValentino filed a counseled PCRA appeal, asserting a single claim that his trial counsel was constitutionally deficient for not objecting to the trial court sending to the jury "inflammatory" photographs of the victim's crashed car from the New York State I-84 incident.  Id., at *2, *3.  The Superior Court thoroughly reviewed and rejected that claim and affirmed the PCRA court's denial of post-conviction relief.  Id., at *1, *2-5, *10.  The Superior Court also addressed

4

DiValentino's other post-conviction claims that he had argued were improperly abandoned by his PCRA counsel. See id., at *5-10. Those claims were likewise rejected. See id., at *6-10. On July 26, 2023, the Pennsylvania Supreme Court again denied DiValentino's petition for allowance of appeal. Commonwealth v. DiValentino, No. 92 MAL 2023, 302 A.3d 628 (Pa. 2023) (table).

In January 2024, DiValentino lodged the instant Section 2254 petition in this court. (See generally Doc. 1). On March 7, 2024, after several extensions of time, Respondent filed a thorough response. (See generally Docs. 8, 21). A lengthy and complicated process then ensued to serve that response on DiValentino at Green Haven Correctional Facility in Stormville, New York. (See Docs. 9-23). DiValentino was finally served with a copy of Respondent's answer on October 10, 2024. (See Doc. 24 at 1). He filed a traverse on December 10, 2024. (Doc. 26).

On October 30, 2025, the court issued a show-cause order, directing DiValentino to address the issues of exhaustion of state remedies and procedural default as to his first two grounds for relief. (See Doc. 29). After an extension of time, DiValentino filed his show-cause response, arguing that he had fairly presented his federal claims to the state courts. (See generally Doc. 32). His Section 2254 petition is thus fully briefed and ripe for disposition.

## II.    STANDARD OF REVIEW

The Antiterrorism and Effective Death Penalty Act of 1996 (AEDPA), 28 U.S.C. §§ 2241-2254, mandates that petitioners demonstrate that they have "exhausted the remedies available in the courts of the State" before seeking federal habeas relief.   Id. § 2254(b)(1)(A).   An exhausted claim is one that has been "fairly presented" to the state courts "by invoking one complete round of the State's established appellate review process," and which has been adjudicated on the merits.  Carpenter v. Vaughn, 296 F.3d 138, 146 (3d Cir. 2002) (quoting O'Sullivan v. Boerckel, 526 U.S. 838, 844-45 (1999)); see also Johnson v. Williams, 568 U.S. 289, 302 (2013).

If a state prisoner has not fairly presented a claim to the state courts "but state law clearly forecloses review, exhaustion is excused, but the doctrine of procedural default may come into play."  Carpenter, 296 F.3d at 146 (citations omitted).  Generally, if a prisoner has procedurally defaulted on a claim by failing to raise it in state-court proceedings, a federal habeas court will not review the merits of the claim, even one that implicates constitutional concerns.  Martinez v. Ryan, 566 U.S. 1, 9 (2012) (citing Coleman v. Thompson, 501 U.S. 722, 747-48 (1991); Wainwright v. Sykes, 433 U.S. 72, 84-85 (1977)).

A few limited exceptions to this rule exist.  One exception is that "[a] prisoner may obtain federal review of a defaulted claim by showing cause for the

default and prejudice from a violation of federal law." Id. at 10 (citing Coleman, 501 U.S. at 750). "Cause for a procedural default exists where something external to the petitioner, something that cannot fairly be attributed to him[,] . . . impeded [his] efforts to comply with the State's procedural rule." Maples v. Thomas, 565 U.S. 266, 280 (2012) (alterations in original) (citations and internal quotation marks omitted). To establish prejudice, a petitioner must show not merely that there were errors that created a possibility of prejudice, but that they "worked to his actual and substantial disadvantage, infecting his entire trial with error of constitutional dimensions." Holland v. Horn, 519 F.3d 107, 112 (3d Cir. 2008) (quoting United States v. Frady, 456 U.S. 152, 170 (1982)). If cause and prejudice are established, the federal court reviews the claim *de novo* "because the state court did not consider the claim on the merits." Bey v. Superintendent Greene SCI, 856 F.3d 230, 236 (3d Cir. 2017), cert. denied sub nom. Gilmore v. Bey, 138 S. Ct. 740 (2018) (mem.) (citation omitted).

Another rare exception that will excuse a procedural default is if the petitioner can show that "failure to consider the claim will result in a fundamental 'miscarriage of justice.'" Carpenter, 296 F.3d at 146 (quoting Coleman, 501 U.S. at 750). To satisfy the "fundamental miscarriage of justice" exception, a petitioner typically will have to show actual innocence. Leyva v. Williams, 504 F.3d 357, 366 (3d Cir. 2007) (citation omitted).

7

## III.   DISCUSSION

In his Section 2254 petition, DiValentino raises five grounds for relief: (1) he was denied his "Constitutional right to a speedy trial and Due Process" under the Sixth and Fourteenth Amendments; (2) the trial court permitted irrelevant and highly prejudicial evidence in violation of due process under the Fourteenth Amendment; (3) the trial court permitted testimonial hearsay in violation of the Confrontation Clause of the Sixth Amendment; (4) the evidence was insufficient to find DiValentino guilty of kidnapping; and (5) trial counsel was ineffective for failing to object to prejudicial photographs being provided to the jury during its deliberations. (Doc. 1 at 5-16). After careful review, the court finds that none of these claims warrants relief.

### A.   Ground One – Speedy Trial

As recounted above, DiValentino was arrested on March 21, 2010, and charged with simple assault and harassment (criminal docket number CP-45-CR-0000792-2010). After being released on bail, he was arrested again on April 22, 2010, and charged with numerous, more serious offenses including unlawful restraint, criminal coercion, stalking, possession of an instrument of crime, simple assault, reckless endangerment, false imprisonment, harassment, kidnapping, intimidation of witnesses and victims, retaliation against a witness, and terroristic threats (criminal docket number CP-45-CR-0000840-2010). DiValentino was

8

released on bail for the April 22 charges on June 10, 2010. Several days later, following the June 14, 2010 I-84 incident, he was taken into custody by New York State authorities to await trial on the criminal charges stemming from that event. DiValentino remained in New York's custody until October 7, 2015, when he was retrieved by Pocono Mountain Regional Police Department officers for his transfer to Pennsylvania. (See Doc. 34-2 at 120-23).

According to Respondent, on October 23, 2015, a bench warrant hearing was held, at which time the bench warrant was dissolved and the case was listed for trial on December 1, 2015. (See Doc. 8-1 at 11). Due to DiValentino's outstanding motion *in limine*, his trial was continued until the February 2016 trial term. (See id.). DiValentino then filed a motion to continue trial, which resulted in trial being continued until March 1, 2016. (Id.) On February 24, 2016, the Commonwealth filed a motion to extend the deadline under the Interstate Agreement on Detainers Act (IADA) for 180 days. (Id. at 12). That motion was granted on February 25, 2016. (Id.) DiValentino's jury trial took place from June 21 to June 23, 2016. DiValentino, Nos. 787 EDA 2017, 788 EDA 2017, 2018 WL 3827259, at *2.

DiValentino first asserted his speedy trial claim in the trial court. (See Doc. 8-8 ("Defendant's Brief in Support of Rule 600 and Violation of Interstate Act Agreement on Detainers [sic] Dismissal," filed June 10, 2016)). In his brief,

9

DiValentino—through counsel—argued that the Commonwealth had violated Pennsylvania Rule of Criminal Procedure 600 and the IADA, failing to bring DiValentino to trial in a timely manner. (See id. at 4-16). The trial court denied these motions for dismissal. (See Doc. 8-26 at 1). On appeal, DiValentino again cabined his claim to arguing that the Commonwealth had violated Rule 600 and the IADA by bringing him to trial approximately six years after filing the 2010 charges against him. DiValentino, Nos. 787 EDA 2017, 788 EDA 2017, 2018 WL 3827259, at *2-3; Brief of Appellant, DiValentino, Nos. 787 EDA 2017, 788 EDA 2017, 2017 WL 6996073, at *17-19, *26-35 (Pa. Super. Ct. Aug. 24, 2017).

In his "Statement of Matters Complained of on Appeal," see PA. R. APP. P. 1925(b), DiValentino claimed that the trial court had "erred" when it denied his "right to a speedy trial pursuant to Pa.R.C[rim].P. 600 and all procedural requirements of the Interstate Agreement on Detainers." (Doc. 8-4 at 1). The Superior Court of Pennsylvania described his claim on appeal as asking whether "the trial court err[ed] in denying [DiValentino's] motion to dismiss where the Commonwealth denied him his *constitutional right to a speedy trial* by greatly exceeding the time frames established by [ ] Rule 600 as well as the [Interstate Agreement on Detainers ("IAD")] for bringing the matter to trial[.]" DiValentino, Nos. 787 EDA 2017, 788 EDA 2017, 2018 WL 3827259, at *2 (emphasis added) (second, fourth, and fifth alterations in original).

10

Thus, although DiValentino appears to have done the bare minimum needed to "fairly present" his federal constitutional speedy trial claim in state court, no constitutional analysis ever occurred. This is entirely understandable, however, because DiValentino *never* discussed the contours of a Sixth Amendment speedy trial claim in his briefing to the trial and appellate courts, nor did he cite a state or federal case containing federal constitutional analysis. Rather, DiValentino pressed speedy trial arguments exclusively based on Rule 600 and the IADA.

Nevertheless, DiValentino clearly raised a claim under the IADA, which is a "congressionally sanctioned interstate compact within the Compact Clause" of Article I of the United States Constitution and thus a "federal law" within the meaning of 28 U.S.C. § 2254. See Carchman v. Nash, 473 U.S. 716, 719 (1985) (citations omitted). Additionally, he "fairly presented" his Sixth Amendment speedy trial claim even though it was not discussed by the state courts. Accordingly, the court will examine each claim in turn.

### 1.   IADA

The Interstate Agreement on Detainers Act (IADA), 18 U.S.C. App. 2; 42 PA. CONS. STAT. § 9101, is a compact between 48 states, the District of Columbia, and the federal government that was enacted to address the problems that arise when two jurisdictions have charges outstanding against a single

11

person.  See Alabama v. Bozeman, 533 U.S. 146, 148 (2001); United States v. Cappucci, 342 F. Supp. 790, 791 (E.D. Pa. 1972).  The purpose of the agreement, as stated in its first Article, is "to encourage the expeditious and orderly disposition of such charges and determination of the proper status of any and all detainers based on untried indictments, informations, or complaints."  18 U.S.C. App. 2, Art. I.  To accomplish this purpose, the IADA "creates uniform procedures for lodging and executing a detainer" and "provides for expeditious delivery of the prisoner to the receiving State for trial prior to the termination of his sentence in the sending State."  Bozeman, 533 U.S. at 148.

Article III of the IADA sets out the procedure by which "a prisoner against whom a detainer has been filed can demand a speedy disposition of the charges giving rise to the detainer"; whereas Article IV "provides the means by which a prosecutor who has lodged a detainer against a prisoner in another State can secure the prisoner's presence for disposition of the outstanding charges."  United States v. Mauro, 436 U.S. 340, 351 (1978).  Under Article IV(c), when a prosecutor seeks temporary custody of a prisoner detained in another party state (the "sending" state) and presents a written request for custody of that prisoner based on an untried indictment, information, or complaint, the prosecutor has 120 days to commence trial after arrival of the prisoner in the receiving state.  See 18 U.S.C. App. 2, Art. IV(c).  This 120-day deadline can be continued "for good

cause shown in open court," with either the prisoner or his counsel present. Id. Moreover, the IADA clock also pauses ""whenever and for as long as the prisoner is unable to stand trial, as determined by the court having jurisdiction on the matter." Id. App. 2, Art. VI(a).

Both the trial court and the Superior Court of Pennsylvania considered and rejected DiValentino's IADA claim. The Superior Court based its decision on the reasoning of the trial court. See DiValentino, Nos. 787 EDA 2017, 788 EDA 2017, 2018 WL 3827259, at *3. This court thus looks to the trial court's rationale and finds that the state court's decision was not an unreasonable application of federal law.

First, it is clear that DiValentino never made an IADA request under Article III for transfer to Pennsylvania to be tried on the outstanding 2010 charges. The only IADA request for temporary transfer of custody came from the prosecution. Consequently, the prosecution had 120 days from October 7, 2015—when the Commonwealth took DiValentino into custody—to bring him to trial. 18 U.S.C. App. 2, Art. IV(c).

However, DiValentino took multiple actions that paused or tolled the IADA's 120-day clock, including the filing of his motion *in limine* (which was not initially resolved until February 25, 2016, and not fully resolved until directly before trial), his January 13, 2016 motion to continue trial, his motion to dismiss based on the

13

IADA and Rule 600 (filed on March 28, 2016), and several other motions filed in March and April 2016 that were not decided until May 31, 2016. (See Doc. 34-3 at 15-17 (explaining trial court's IADA and Rule 600 calculations)); Commonwealth v. DiValentino, No. CP-45-CR-0000840-2010 (Pa. Ct. Com. Pl. Monroe Cnty.). These actions by DiValentino tolled the IADA's 120-day clock, just as they tolled the state's Rule 600 speedy trial clock. Cf. United States v. Peterson, 945 F.3d 144, 154 (4th Cir. 2019) ("[E]very circuit court to reach the issue has agreed that periods excludable under the [Speedy Trial Act] for 'ends of justice' continuances should also toll the 120-day clock under the IADA's substantially similar 'good cause' continuance provision."); United States v. King, No. 22-3095, 2024 WL 3887274, at *5-6 (3d Cir. Aug. 21, 2024) (nonprecedential); Commonwealth v. Montione, 720 A.2d 738, 741 (Pa. 1998) (holding, as a matter of first impression, that delay "occasioned by the defendant is excludable" under IADA).

In light of these numerous excludable delays, the trial court's determination that the IADA's 120-day deadline was not violated was correct (and therefore reasonable). This is true regardless of whether the court considers the Commonwealth's motion to continue the IADA's deadline, which the trial court granted. And because the state court's application of federal law was reasonable, no habeas relief is due.

14

## 2.    Sixth Amendment Speedy Trial Claim

The Sixth Amendment to the United States Constitution guarantees that "[i]n all criminal prosecutions, the accused shall enjoy the right to a speedy . . . trial[.]" U.S. Const. amend. VI.  The Sixth Amendment's speedy trial guarantee is binding on the states through the Fourteenth Amendment.  Klopfer v. North Carolina, 386 U.S. 213, 222-23 (1967).

In Barker v. Wingo, 407 U.S. 514 (1972), the Supreme Court of the United States set out the relevant factors for assessing constitutional speedy trial claims: "Length of delay, the reason for the delay, the defendant's assertion of his right, and prejudice to the defendant." Barker, 407 U.S. at 530.  With respect to prejudice, the Supreme Court has identified three interests which the speedy trial right was designed to protect: (1) "to prevent oppressive pretrial incarceration"; (2) "to minimize anxiety and concern of the accused"; and (3) "to limit the possibility that the defense will be impaired." Id. at 532.  No single Barker factor is dispositive or "talismanic"; rather, all factors must be considered and weighed. Kennedy v. Sup't Dallas SCI, 50 F.4th 377, 382 (3d Cir. 2022) (quoting Hakeem v. Beyer, 990 F.2d 750, 759 (3d Cir. 1993)).

As explained above, although DiValentino raised a constitutional speedy trial claim and the Superior Court of Pennsylvania acknowledged it (rather than overlooking or disregarding it), the claim appears to have been denied without

15

discussion.  Yet that disposition does not mean that this court can review the claim without the deference required by the AEDPA.  "Where a state court's decision is unaccompanied by an explanation, the habeas petitioner's burden still must be met by showing there was no reasonable basis for the state court to deny relief."  Harrington v. Richter, 562 U.S. 86, 98 (2011).  The state court's denial, moreover, is presumed to be on the merits: "When a federal claim has been presented to a state court and the state court has denied relief, it may be presumed that the state court adjudicated the claim on the merits in the absence of any indication or state-law procedural principles to the contrary."  Id. at 99 (citation omitted); Johnson v. Williams, 568 U.S. 289, 301 (2013) ("When a state court rejects a federal claim without expressly addressing that claim, a federal habeas court must presume that the federal claim was adjudicated on the merits—but that presumption can in some limited circumstances be rebutted.").

Neither DiValentino nor Respondent has offered argument or evidence to rebut the presumption that the constitutional speedy trial claim was denied on the merits without discussion.  Thus, AEDPA deference applies.  See Harrington, 562 U.S. at 98; Johnson, 568 U.S. at 301-02.  Consequently, this court must ask whether the state court's denial of DiValentino's constitutional speedy trial claim was contrary to or involved an unreasonable application of clearly established federal law or was based on an unreasonable determination of the facts in light of

16

the evidence presented in the state court proceeding.  See Harrington, 562 U.S. at 97-98; 28 U.S.C. § 2254(d).

Neither DiValentino nor Respondent attempts to argue their respective position on the Sixth Amendment speedy trial claim.  Respondent does not mention it, and DiValentino—although generally referencing the "U.S. Constitution" in his traverse (see Doc. 26 at 2-4)—does not identify or discuss any of the relevant Barker factors.  Nevertheless, this court "must determine what arguments or theories . . . could have supported . . . the state court's decision; and then it must ask whether it is possible fairminded jurists could disagree that those arguments or theories are inconsistent with the holding in a prior decision of [the Supreme Court of the United States]."  Harrington, 562 U.S. at 102.

A Sixth Amendment speedy trial analysis begins with the length of delay. DiValentino was arrested and charged with the at-issue offenses in March and April 2010, and he was not tried until June 2016, an approximate delay of six years and two months.  This length of delay is plainly sufficient to trigger a speedy trial inquiry, the first step in the length-of-delay analysis.  See Barker, 407 U.S. at 530; Hakeem, 990 F.2d at 759-60.

The second aspect of the length-of-delay analysis considers "the extent to which the delay stretches beyond the bare minimum needed to trigger judicial examination of the claim."  Doggett v. United States, 505 U.S. 647, 652 (1992).

17

DiValentino's case is substantially more complicated than the run-of-the-mill speedy trial claim. That is because he was arrested in New York State in June 2010 and held on charges based on the I-84 incident. Then, while awaiting trial, he was indicted by a New York State grand jury on February 10, 2011, on separate charges of conspiracy and solicitation to commit murder for attempting to hire someone to kill Andrews. See DiValentino, Nos. 787 EDA 2017, 788 EDA 2017, 2018 WL 3827259, at *1. It appears that the separate indictments were consolidated on June 30, 2011. See Affirmation in Opposition, People v. DiValentino, 2012 WL 12937231, at *2 (N.Y. App. Div. Oct. 22, 2012). That same day, DiValentino entered a plea of guilty to attempted murder in the second degree and conspiracy in the second degree, and on August 17, 2011, was sentenced to 15 years' imprisonment for attempted murder and a consecutive 3 to 12 years' imprisonment for conspiracy. See People v. DiValentino, 971 N.Y.S.2d 342, 342, 343 (N.Y. App. Div. 2013).

DiValentino appealed, claiming that his guilty plea was involuntary, and on September 25, 2013, a New York State appellate court reversed his August 17, 2011 convictions and sentence, vacated his guilty plea, and remitted the case to the county court for further proceedings. Id. at 344. On March 30, 2015, following a jury trial, DiValentino was convicted of attempted assault in the first degree, intimidating a victim or witness in the second degree (three counts),

18

criminal mischief in the second degree, aggravated criminal contempt, criminal contempt in the first degree, conspiracy in the second degree, and criminal solicitation in the second degree. See People v. DiValentino, 62 N.Y.S.3d 488, 488 (N.Y. App. Div. 2017). It is undisputed that shortly after his March 30, 2015 conviction, on May 12, 2015, the Commonwealth made a formal request for transfer of custody. (See Doc. 8-8 at 8; Doc. 34-2 at 110-13). DiValentino eventually waived extradition on September 11, 2015, (see Doc. 8-8 at 8; Doc. 34-2 at 118), and was taken into custody by Pennsylvania law enforcement agents on October 7, 2015.

In view of these facts, the delay at issue shrinks to approximately three years (i.e., from August 2011 to September 2013, and from April 2015 to June 2016) because, during the other periods, DiValentino was in pretrial proceedings in New York State and unavailable for transfer to Pennsylvania. See King, No. 22-3095, 2024 WL 3887274, at *4 (excluding consideration of delay caused by defendant in length-of-delay analysis). DiValentino concedes as much. (See Doc. 26 at 3). This type of delay (roughly three times the delay that would trigger a speedy trial inquiry) weighs only moderately in favor of DiValentino.

The second Barker factor is the reason for the delay. As noted above, approximately half of the six-year delay was occasioned by DiValentino's own criminal conduct and the prosecution of his cases in New York State.

19

Additionally, much of the time from DiValentino's March 30, 2015 New York State conviction to his June 2016 Pennsylvania trial involved procedural matters regarding transfer of custody, resolution of DiValentino's pretrial motions, and excludable time based on DiValentino's own request for a trial continuance. These reasons "serve to justify appropriate delay." Barker, 407 U.S. at 531; Wells v. Petsock, 941 F.2d 253, 258 (3d Cir. 1991).

Thus, the only period of delay that could possibly weigh in DiValentino's favor is the two-year span from August 2011 (when he was originally sentenced following his guilty plea) to September 2013 (when the New York appellate court vacated his guilty plea, convictions, and sentence). The facts surrounding this time period are disputed. Respondent alleges that DiValentino "fought extradition." (Doc. 8-1 at 11). DiValentino claims that the Commonwealth failed to provide evidence that it sought temporary custody or that he or the state of New York refused extradition. (Doc. 26 at 3).

The trial court, after holding a hearing and considering extensive evidence (both oral and documentary), determined that during this time, the government had exercised "due diligence in trying to bring" DiValentino to Pennsylvania for trial. (See Doc. 34-3 at 14; see also Doc. 34-1 at 35-39; Doc. 34-2 at 94-108; Doc. 34-4 at 25, 27-28). While DiValentino may disagree with this finding, he has not established that the trial court's determination was an *unreasonable*

20

determination of the facts in light of the evidence presented in state court. 28 U.S.C. § 2254(d)(2). Nor has he shown "by clear and convincing evidence" that the trial court's factual determinations were incorrect. Id. § 2254(e)(1). Thus, the second Barker factor plainly weighs in the government's favor, as most if not all the delay was beyond the prosecution's control and there were "valid reason[s]" for it. See Barker, 407 U.S. at 531.

Assuming for the sake of argument that the facts are as DiValentino claims, he has not alleged or proven that the Commonwealth's purported delay was intentional or deliberate. See Wells, 941 F.2d at 258 (citing Barker, 407 U.S. at 531). At most, according to DiValentino's version of events, the delay from 2011 to 2013 exemplified negligence by the prosecution, which is a more "neutral reason" that is to be "weighted less heavily against the government." Barker, 407 U.S. at 531. Negligence "still falls on the wrong side of the divide between acceptable and unacceptable reasons for delaying a criminal prosecution once it has begun," Doggett, 505 U.S. at 657, albeit less heavily than intentional or bad-faith delay, United States v. Valazquez, 749 F.3d 161, 175 (3d Cir. 2014) (citing Barker, 407 U.S. at 531). So even under DiValentino's version of the facts, he is "more to blame for th[e] delay" than the government, as his own conduct is responsible for roughly four of the six years of delay. See Kennedy, 50 F.4th at 382-83; United States v. Dent, 149 F.3d 180, 184-85 (3d Cir. 1998).

21

Yet, as explained above, the trial court's factual findings are not unreasonable or refuted by clear and convincing evidence. Therefore, its determination that the Commonwealth acted diligently in attempting to bring DiValentino to trial from 2011 to 2013 is owed AEDPA deference, resulting in the second Barker factor squarely favoring the government.

The third Barker factor is the defendant's assertion of his right to a speedy trial. Review of this factor requires a court to examine ""[w]hether and how a defendant asserts his [speedy-trial] right," . . . including "the frequency and force" of such assertions." Velazquez, 749 F.3d at 181-82 (citations omitted) (first and second alterations in original).

This factor weighs against DiValentino, as he never sought transfer to Pennsylvania or asserted a speedy trial claim during the roughly five years he was incarcerated in New York State. Indeed, the "failure to assert the right will make it difficult for a defendant to prove that he was denied a speedy trial." Barker, 407 U.S. at 532.

It does not appear that DiValentino or his counsel raised a speedy trial claim until March 28, 2016, see DiValentino, No. CP-45-CR-0000840-2010 (Pa. Ct. Com. Pl. Monroe Cnty.), and he was tried less than three months later. See Barker, 407 U.S. at 534-35 (explaining that defendant apparently "did not want a speedy trial" because his appointed counsel never sought one throughout most

22

of the period of delay); Hakeem, 990 F.2d at 764 (noting that circuit courts have emphasized the petitioner's need to show he "vigorously pursued a speedy trial" if third Barker factor is to weigh in his favor (citation omitted)). Accordingly, this third factor also weighs in the government's favor.

The fourth and final Barker factor is prejudice to the defendant, the most critical factor. See Wells, 941 F.2d at 258. As noted above, prejudice considers three interests which the speedy trial right was designed to protect: (1) "to prevent oppressive pretrial incarceration"; (2) "to minimize anxiety and concern of the accused"; and (3) "to limit the possibility that the defense will be impaired." Barker, 407 U.S. at 532.

The first two interests are not implicated here. That is because DiValentino's pretrial detention was based on separate crimes he committed in New York State. In point of fact, he had been granted bail for both of his Pennsylvania cases and would not have been detained pretrial had he not committed numerous additional criminal offenses in New York. Additionally, DiValentino appears to have been exclusively concerned with the New York State charges (which included the serious charge of attempted murder), as he did not seek transfer to Pennsylvania, raise a speedy trial claim, or even file a substantive motion in his Pennsylvania criminal cases for approximately five of the six years at issue.

23

As to the third interest, DiValentino has failed to allege or establish any actual impairment to his defense occasioned by the delay of his trial. He never argued such prejudice when he raised his initial motion to dismiss in the trial court, (see generally Doc. 8-8), or on appeal to the Superior Court, see Brief of Appellant, DiValentino, Nos. 787 EDA 2017, 788 EDA 2017, 2017 WL 6996073, at *17-19, *26-35, and he does not do so now, (see Doc. 26 at 1-5). Rather, his arguments rely solely on the mechanical calculations of the IADA and Rule 600.

It is of course true that "affirmative proof of particularized prejudice is not essential to every speedy trial claim." Doggett, 505 U.S. at 655. But under the circumstances of DiValentino's case, where most of the factors tilt in the government's favor, any presumed prejudice from delay attributable to the government does not rise to the level of warranting relief. See United States v. Claxton, 766 F.3d 280, 296-97 (3d Cir. 2014) (noting that presumptive prejudice described in Doggett "cannot alone carry a Sixth Amendment claim without regard to the other Barker criteria," and finding that 19-month delay attributable to the government was insufficient to warrant designation as presumptively prejudicial). This is especially true when viewing the facts as found by the trial court, and remains true even if considering the facts as alleged by DiValentino. Consequently, the fourth factor likewise favors the government, as there is an absence of prejudice—actual or presumed—in DiValentino's case.

24

In sum, only the first Barker factor cuts in DiValentino's favor, and even that factor is not strongly weighted in his direction. Accordingly, the state court's denial of DiValentino's Sixth Amendment speedy trial claim was not an unreasonable application of federal law, so no habeas relief is due. Moreover, even if the state courts had overlooked or disregarded the Sixth Amendment claim and thus *de novo* review was required, DiValentino's constitutional speedy trial claim would still fail.

## B.    Ground Two – Fourteenth Amendment Due Process

In his second ground for relief, DiValentino argues that the admission of unspecified evidence from the June 14, 2010 I-84 incident in his Pennsylvania trial violated his Fourteenth Amendment due process rights. (Doc. 1 at 8). This constitutional claim, once again, was only fleetingly raised in state court, (see Doc. 8-4 at 1-2), but not discussed in constitutional terms by DiValentino, the government, or the state courts. Rather, the arguments raised and considered revolved around the Pennsylvania Rules of Evidence, in particular Rule 404(b). See Brief of Appellant, DiValentino, Nos. 787 EDA 2017, 788 EDA 2017, 2017 WL 6996073, at *19-21, *35-47; (Doc. 8-7 ("Defendant's Brief Contra to Commonwealth's 404(b) Motion")); DiValentino, Nos. 787 EDA 2017, 788 EDA 2017, 2018 WL 3827259, at *4.

25

In this regard, DiValentino's assertion that he exhausted his evidentiary Fourteenth Amendment due process claim in state court "barely passes muster." Cf. Minett v. Hendricks, 135 F. App'x 547, 552 (3d Cir. 2005) (nonprecedential) (finding that petitioner just barely established state exhaustion by explicitly invoking "the Due Process Clause of the Fourteenth Amendment" and citing one Supreme Court case). It appears that the *only* time DiValentino mentioned a due process claim is in his Rule 1925(b) Statement. (See Doc. 8-4 at 1-2). In his actual brief on appeal to the Superior Court of Pennsylvania, DiValentino does not reference due process, the Fourteenth Amendment, or even a "fair trial." See Brief of Appellant, DiValentino, Nos. 787 EDA 2017, 788 EDA 2017, 2017 WL 6996073, at *19-21, *35-47. Instead, his argument is limited to a discussion of Pennsylvania Rules of Evidence and his contention that the trial court "committed reversible error" or "abused its discretion" by admitting other act evidence. See id., at *3, *19-21, *35-47.

The court will err on the side of caution and review the merits of DiValentino's due process claim. Nevertheless, it is highly questionable whether his single, unadorned assertion of a violation of the Due Process Clause of the Fourteenth Amendment in his Rule 1925(b) Statement, without more, "fairly presented" his federal claim to the state court. This is especially true when his subsequent brief does not contain a single reference to due process or a citation

26

to relevant case law, thereby appearing to abandon any constitutional dimension to his claim on appeal.

With this caveat, the court turns to the merits of the claim. DiValentino and Respondent again utterly fail to argue their respective positions on the due process claim. Respondent does not mention it, and DiValentino only perfunctorily references the Due Process Clause in his Section 2254 petition. (See Doc. 1 at 8). DiValentino's traverse primarily disputes several findings of fact in the state court and does not engage whatsoever with an evidentiary Fourteenth Amendment due process claim. (See Doc. 26 at 5-7). Once more, therefore, this court "must determine what arguments or theories . . . could have supported . . . the state court's decision; and then it must ask whether it is possible fairminded jurists could disagree that those arguments or theories are inconsistent with the holding in a prior decision of [the Supreme Court of the United States]." Harrington, 562 U.S. at 102.

In rare circumstances, the erroneous admission of evidence may violate the Due Process Clause of the Fourteenth Amendment if the evidence was "so unduly prejudicial" as to render the trial "fundamentally unfair." See Andrew v. White, 604 U.S. 86, 95-96 (2025) (quoting Payne v. Tennessee, 501 U.S. 808, 825 (1991)). To warrant relief, a petitioner must establish that the evidence at issue "so infected the trial with unfairness" as to render the conviction or

27

sentence "a denial of due process." Id. at 96 (citation omitted); see Romano v. Oklahoma, 512 U.S. 1, 12-13 (1994); Keller v. Larkins, 251 F.3d 408, 413 (3d Cir. 2001). This due process standard represents an exceedingly "narrow" avenue for relief. See Fahy v. Horn, 516 F.3d 169, 202 (3d Cir. 2008).

DiValentino claims that the admission of unspecified evidence concerning the June 14, 2010 New York State I-84 incident was irrelevant and highly prejudicial. (Doc. 1 at 8). The Superior Court rejected DiValentino's claim that admission of the evidence was erroneous. See DiValentino, Nos. 787 EDA 2017, 788 EDA 2017, 2018 WL 3827259, at *4. The panel agreed with the trial court's determination that, *inter alia*, the New York State incidents constituted *res gestae* evidence. Id.

In the trial court's view, DiValentino's multiple, related criminal cases were "poster cases" for Pennsylvania's *res gestae* exception to the general inadmissibility of other act evidence, as they "unquestionably provided context for and the complete story of the events surrounding the crimes charged in Pennsylvania." (See Doc. 8-2 at 14). The Supreme Court of Pennsylvania has explained that evidence of other acts is admissible where the particular crime or act was part of a chain, sequence, or natural development of events forming the history of a case. See Commonwealth v. Robinson, 864 A.2d 460, 496 (Pa. 2004). The *res gestae* exception is also known as the "complete story rationale,"

permitting admission of other act evidence "to complete the story of the crime on trial by proving its immediate context of happenings near in time and place." Id. (quoting Commonwealth v. Lark, 543 A.2d 491, 497 (Pa. 1988)).

As the trial court explained, DiValentino's related crimes began with assaulting Andrews; then escalated to harassing and threatening her at gunpoint to not testify against him for the charges stemming from that assault; then—only a few days after his release on bond in Pennsylvania—escalated even further to attempting to kill her with his vehicle; and culminated in attempting to hire *someone else* to kill her while he was incarcerated in New York. (See Doc. 8-2 at 14). Nowhere in DiValentino's habeas petition, traverse, or other filings does he engage with the *res gestae* exception or explain why the admission of the at-issue evidence violated the rules of evidence or his due process rights. This is fatal for DiValentino's habeas claim, as it is his burden to show that the state court's decision is contrary to or involved an unreasonable application of clearly established federal law. See Matteo v. Sup't, SCI Albion, 171 F.3d 877, 888 (3d Cir. 1999) (explaining that "the petitioner must demonstrate that Supreme Court precedent *requires* the contrary outcome"). Failing to show that the trial court's admission of evidence violated the state's rules of evidence leads to the unavoidable conclusion that there was no due process infringement, because

properly admitted evidence could not have "so infected the trial" as to make it "fundamentally unfair."

Additionally, the trial court listed numerous other bases for the admission of the other act evidence. It reasoned that DiValentino's subsequent New York State actions were relevant to show consciousness of guilt, flight, and attempt to eliminate a material witness. (Doc. 8-2 at 15). The trial court also found that the evidence was permissible to show "motive, opportunity, intent, preparation, plan, and knowledge." (Id. at 14). DiValentino does not counter this additional reasoning. In fact, he does not address it at all. Accordingly, he has failed to demonstrate that the at-issue evidence was erroneously admitted, much less that its admission "so infected the trial with unfairness" that it rendered his conviction a violation of due process.

In summary, it is highly questionable whether DiValentino fairly presented his Fourteenth Amendment due process claim to the state courts. The court will assume that his single reference to this constitutional amendment in his Rule 1925(b) Statement passes muster and thus he avoided procedural default of this claim. Under this assumption (and without rebuttal from either party), it follows that the state courts denied the claim on the merits, although without discussion.

DiValentino, however, has not carried his burden to show that the state court's denial of his Fourteenth Amendment due process claim was contrary to or

30

involved an unreasonable application of federal law.  He has not established that the admission of evidence violated the state's rules of evidence, much less that it offended the constitution or contradicted Supreme Court jurisprudence.  Rather, it is quite possible that fairminded jurists could disagree that the state court's arguments or theories are inconsistent with the holding in a prior Supreme Court decision, Harrington, 562 U.S. at 102, so no habeas relief is due.

## C.    Ground Three – Confrontation Clause

DiValentino next contends that the trial court permitted testimonial hearsay in violation of the Sixth Amendment's Confrontation Clause.  (Doc. 1 at 9).  As part of DiValentino's trial, the prosecution introduced audio recordings of conversations between DiValentino and a prison informant, which recorded conversations included DiValentino's attempt "to hire a third party to kill []  Andrews." (Doc. 8-2 at 19).  In his Section 2254 petition, DiValentino argues that a police investigator was permitted to testify about a conversation the investigator had with a jailhouse informant to facilitate the audio recordings, even though the jailhouse informant was available to testify, thereby eliminating any chance for cross-examination of the informant.  (See Doc. 1 at 9).

This argument, however, was never properly exhausted in state court.  The only Confrontation Clause claim DiValentino raised in the trial court was that admission of the audio recording itself violated the Sixth Amendment.  (See Doc.

31

8-2 at 1; Doc. 8-4 at 2). The trial court, therefore, based its *entire* Rule 1925(a) opinion on assessing the contents of the audio recording and its admissibility under the Confrontation Clause. (See Doc. 8-2 at 19-24). The Superior Court likewise confined its discussion to the admissibility of the recorded statements, as that is the only argument that was preserved for appeal. See DiValentino, Nos. 787 EDA 2017, 788 EDA 2017, 2018 WL 3827259, at *4-5.

As such, DiValentino has procedurally defaulted any Confrontation Clause claim regarding the admissibility of the police investigator's testimony with respect to his conversation with the informant to arrange for the audio recording. That claim was not fairly presented to the trial court and pressed through one complete round of appellate review with a decision on the merits. Therefore, the court will liberally construe DiValentino's petition as raising the Confrontation Clause claim that was properly exhausted and decided on the merits in state court. Otherwise, ground three would be procedurally defaulted and unreviewable. Martinez, 566 U.S. at 9.

The Sixth Amendment provides that "[i]n all criminal prosecutions, the accused shall enjoy the right . . . to be confronted with the witnesses against him." U.S. Const. amend. VI. The Confrontation Clause "guarantees a defendant's right to confront those 'who bear testimony against him.'" See Melendez-Diaz v. Massachusetts, 557 U.S. 305, 309 (2009) (quoting Crawford v.

Washington, 541 U.S. 36, 51 (2004)).  This constitutional provision, therefore, bars "admission of testimonial statements of a witness who did not appear at trial unless he was unavailable to testify[] and the defendant had had a prior opportunity for cross-examination."  Crawford, 541 U.S. at 53-54.  The key question for application of the Confrontation Clause is whether the out-of-court statements are "testimonial" in nature and thus make the declarant a "witness" against the defendant.  See Davis v. Washington, 547 U.S. 813, 821 (2006).  "It is the testimonial character of the statement that separates it from other hearsay that, while subject to traditional limitations upon hearsay evidence, is not subject to the Confrontation Clause."  Id.

The Superior Court examined DiValentino's Confrontation Clause claim and agreed with the trial court's reasoning that the recorded statements challenged by DiValentino (either those made by the informant or by DiValentino) were "constitutionally admissible."  See DiValentino, Nos. 787 EDA 2017, 788 EDA 2017, 2018 WL 3827259, at *4-5.  In its rationale, the trial court explained that the recorded statements by the informant, even if testimonial, did not violate the Confrontation Clause because they were not introduced to prove the truth of the matter asserted; rather, they provided context for the conversation and made (1) the conversation intelligible to the jury and (2) DiValentino's statements recognizable as admissions.  (See Doc. 8-2 at 20, 21, 24 (citing, *inter alia*, United

States v. Hendricks, 395 F.3d 173, 184 (3d Cir. 2005))).  Additionally, the trial court correctly observed that DiValentino's own recorded statements were admissible because they were admissions and thus not hearsay.  (See id. at 23); FED. R. EVID. 801(d)(2)(A); cf. PA. R. EVID. 803(25)(A) (exception to rule against hearsay permitting admission of opposing party statement regardless of whether declarant is available).

DiValentino has not shown how these state court conclusions were erroneous or unreasonable applications of federal law.  In his traverse, he argues that the audio recordings were unlawfully obtained because they violated Massiah v. United States, 377 U.S. 201 (1964).  (See Doc. 26 at 7-8).  No such claim, however, was presented to the state court and therefore it is procedurally defaulted.

He additionally argues that the informant could not have been a co-conspirator because there was no conspiracy (as the informant was a government agent and not a codefendant).  (See id. at 7).  Yet the trial court's "co-conspiracy" hearsay exception was just one of *numerous* bases for finding the informant's recorded statements admissible.  As noted above, the informant's recorded statements, even if testimonial in nature, were not barred by the Confrontation Clause because they were not introduced to prove the truth of the matter asserted.  See Hendricks, 395 F.3d at 183, 184 (holding that even if

34

confidential informant's surreptitiously recorded statements were testimonial, that would not preclude government from introducing those statements "for a purpose other than establishing the truth of the matters contained therein").

Accordingly, DiValentino has not shown that the state court's rejection of his Confrontation Clause claim was an unreasonable application of federal law. This court, therefore, must deny habeas relief on ground three.

## D.    Ground Four – Sufficiency of the Evidence

On federal habeas review, the level of deference afforded to a state court's decision regarding sufficiency of the evidence is considerable. See Coleman v. Johnson, 566 U.S. 650, 651 (2012). "[A] federal court may not overturn a state court decision rejecting a sufficiency of the evidence challenge simply because the federal court disagrees with the state court. The federal court instead may do so only if the state court decision was 'objectively unreasonable.'" Id. (quoting Cavazos v. Smith, 565 U.S. 1, 2 (2011) (per curiam)).  Moreover, "[b]ecause rational people can sometimes disagree, the inevitable consequence of this settled law is that judges will sometimes encounter convictions that they believe to be mistaken, but that they must nonetheless uphold." Cavazos, 565 U.S. at 2.

DiValentino cannot satisfy the demanding requirement of showing that the state court's sufficiency-of-the-evidence determination was objectively unreasonable. In state court, DiValentino argued that the Commonwealth had

35

failed to proffer sufficient evidence to establish the "place of isolation" element for a kidnapping offense under 18 PA. CONS. STAT. § 2901(a).  (See Doc. 8-4 at 2); Brief of Appellant, DiValentino, Nos. 787 EDA 2017, 788 EDA 2017, 2017 WL 6996073, at *24.  Both the trial court and the Superior Court performed sufficiency-of-the-evidence reviews and determined that the evidence presented at trial was sufficient to show that DiValentino had held Andrews in a "place of isolation."  (See Doc. 8-2 at 25); DiValentino, Nos. 787 EDA 2017, 788 EDA· 2017, 2018 WL 3827259, at *5-6.  In particular, the Superior Court found that DiValentino's conduct of holding Andrews at gunpoint for over an hour in her bedroom and threatening to shoot her if she reached for the phone was sufficient to establish that she had been confined in a place of isolation for a substantial period.  See DiValentino, Nos. 787 EDA 2017, 788 EDA 2017, 2018 WL 3827259, at *6.

This sufficiency determination is not objectively "unreasonable" in any sense of the word.  Rather, it was more than reasonable for the state court to conclude that the "place of isolation" element for kidnapping had been satisfied.

DiValentino appears to contend that the state court's factual determination that he held Andrews at gunpoint was an unreasonable determination of the facts.  (See Doc. 26 at 8-9).  This is so, he argues, because the jury acquitted him of possession of an instrument of crime.  (See id. at 9).  Initially, the court

notes that this argument was not raised in state court with respect to sufficiency of the evidence,[2] and therefore it is procedurally defaulted.

Second, simply because the jury acquitted DiValentino of the offense of possession of an instrument of crime does not mean that there was insufficient evidence of the "place of isolation" kidnapping element. The criminal offense of kidnapping under Pennsylvania law does not require use of a firearm. See 18 PA. CONS. STAT. § 2901(a).[3] Andrews was held against her will for over an hour in her bedroom, and the state court relied on binding Pennsylvania precedent to find that the place-of-isolation element had been satisfied. See DiValentino, Nos. 787 EDA 2017, 788 EDA 2017, 2018 WL 3827259, at *5-6 (citing Commonwealth v. Jenkins, 687 A.2d 836 (Pa. Super. Ct. 1996); In re: T.G., 836 A.2d 1003, 1008 (Pa. Super. Ct. 2003)); (see also Doc. 8-2 at 25; Doc. 34-4 at 66-67 (citing Commonwealth v. Rushing, 99 A.3d 416 (Pa. 2014); Jenkins, 687 A.2d at 838; In re: T.G., 836 A.2d 1003)). DiValentino has proffered no evidence or contrary case law that would indicate that the state court's sufficiency determination was objectively unreasonable or violated federal law.

---

[2] The argument appears to have been asserted as part of DiValentino's challenge to the "deadly weapon" sentencing enhancement. (See Doc. 8-4 at 2).

[3] Even if this were somehow an "inconsistent verdict," it is well established that inconsistent verdicts "do not necessarily show that the jury was not convinced of the defendant's guilt" and do not call for upsetting the jury's seemingly contradictory decision. United States v. Powell, 469 U.S. 57, 64-65 (1984).

Furthermore, as the Superior Court explained, the sentencing court was permitted to enhance DiValentino's sentencing guidelines range under 204 PA. CODE § 303.10(a)(1)(i) by finding—by a preponderance of the evidence during the sentencing hearing—that DiValentino possessed a gun during the April 22 incident. See DiValentino, Nos. 787 EDA 2017, 788 EDA 2017, 2018 WL 3827259, at *6-7. The sentencing court made this finding based on the evidence presented at trial, (see Doc. 8-2 at 3; Doc. 34-3 at 85-86 (Andrews testifying at trial that on the day of the April 22 incident she was "awoken with a gun to [her] back" and that DiValentino threatened to shoot her with it); Doc. 34-4 at 39), and therefore its factual conclusion was not unreasonable.

This court therefore holds that the state court's sufficiency-of-the-evidence determination was not objectively unreasonable, nor did it involve an unreasonable determination of the facts. Ground four of DiValentino's Section 2254 petition is meritless.

### E.    Ground Five – Ineffective Assistance of Counsel

DiValentino's final ground for relief alleges that his trial counsel was ineffective for failing to object to prejudicial photographs of Andrews' wrecked vehicle (following the I-84 incident) being provided to the jury during its deliberations.

38

A collateral attack based on ineffective assistance of counsel in violation of the Sixth Amendment is governed by the familiar two-pronged test set forth in Strickland v. Washington, 466 U.S. 668 (1984). To prevail on such a claim, a criminal defendant must demonstrate that (1) counsel's representation fell below an objective level of reasonableness based on prevailing professional norms, and (2) the deficient representation was prejudicial. Id. at 687-88. The defendant bears the burden of proving both prongs. See id. at 687.

In determining whether counsel has satisfied the objective standard of reasonableness under the first prong, courts must be highly deferential toward counsel's conduct. Id. at 689. There is a strong presumption that counsel's performance falls within the wide range of reasonable professional assistance. See United States v. Gray, 878 F.2d 702, 710 (3d Cir. 1989). Only a "rare claim" of ineffectiveness of counsel should succeed "under the properly deferential standard to be applied in scrutinizing counsel's performance." Id. at 711 (citing Strickland, 466 U.S. at 689-90). To satisfy the prejudice prong, the defendant must establish a reasonable probability that, but for counsel's errors, the outcome of the proceeding would have been different. Strickland, 466 U.S. at 694. The district court need not conduct its analysis of the two prongs in a particular order or even address both prongs of the inquiry if the defendant

39

makes an insufficient showing in one.  See id. at 697; United States v. Lilly, 536 F.3d 190, 196 (3d Cir. 2008).

When a claim of ineffective assistance of counsel has been exhausted in state court, review of that claim by a federal habeas court is significantly circumscribed.  The federal court does not review the ineffectiveness claim *de novo*; rather, "[t]he pivotal question is whether the state court's application of the Strickland standard was unreasonable."  Harrington v. Richter, 562 U.S. 86, 101 (2011); Collins v. Sec'y of Pa. Dep't of Corr., 742 F.3d 528, 546-47 (3d Cir. 2014).  Under this "doubly" deferential standard, "so long as fairminded jurists could disagree on the correctness of the state court's decision," a state court's determination that a Strickland claim lacks merit precludes federal habeas relief. Harrington, 562 U.S. at 101, 105 (citation omitted).

DiValentino properly exhausted this claim in state court, so the doubly deferential standard of review applies.  Accordingly, this court must ask whether the state court's application of Strickland was unreasonable.  It was not.

The Superior Court determined that the PCRA court's substantive ruling was "supported by the evidence and free of legal error."  DiValentino, No. 1007 EDA 2022, 2023 WL 367025, at *5.  The panel determined that there was no deficient performance because DiValentino had failed to establish that the claim

40

had merit, *i.e.*, that the photographs should not have gone out with the jury during deliberations. See id. Quoting the PCRA court, the panel explained,

> the photographs do not depict a bloody or gory scene or other images of the type that might be considered unduly prejudicial. This assessment is borne out by the fact that [DiValentino] in his brief [to the PCRA court] innocuously describes the exhibits as "photos of damage to a motor vehicle allegedly caused by [his] assault on the same victim as the Monroe County case." Simply, the photographs were not by themselves evidence that would inflame the minds and passion of the jury. This is especially true when the photographs are viewed in context and in light and as part of the history of these cases - a history written by [DiValentino] himself.

Id., at *3 (alterations in original). The Superior Court concluded that because the trial court had not erred or abused its discretion in permitting the photographs to go out with the jury, there was no deficient performance by trial counsel in failing to object. See id., at *5. It further held that DiValentino had failed to show prejudice. See id. (citing Commonwealth v. Barnett, 50 A.3d 176, 196 (Pa. Super. Ct. 2012)).

These holdings were not unreasonable applications of Strickland. The trial court provided thorough analysis regarding why the photographs were properly permitted to go out with the jury during deliberations. See id., at *3-4 (quoting PCRA Court Opinion, 3/2/22, at 14-16). DiValentino does not address or counter the trial court's decision in any way. He simply argues—in one paragraph—that this fifth ground for relief has merit because his second ground for relief has merit. (See Doc. 26 at 10). In no way has DiValentino carried his burden to

41

show that his attorney was constitutionally deficient for failing to object to the vehicle photographs going out with the jury; therefore, he has not established that the state court's application of the first Strickland prong was unreasonable. See Preston v. Superintendent Graterford SCI, 902 F.3d 365, 379 (3d Cir. 2018) (noting that an attorney cannot be found deficient for failing to raise a meritless claim); Matteo, 171 F.3d at 888.

Nor has DiValentino attempted to show prejudice. In fact, he does not even mention this second Strickland prong. DiValentino's effort, therefore, falls far short of what is required to demonstrate that habeas relief should be granted. See Matteo, 171 F.3d at 888. When applying the doubly deferential standard of review, as it must, this court concludes that the state court's application of Strickland was reasonable. DiValentino's fifth and final claim does not warrant habeas relief.

## IV.   CONCLUSION

Based on the foregoing, the court will deny DiValentino's petition for a writ of habeas corpus under 28 U.S.C. § 2254. DiValentino has not carried his burden to establish that the state court's decisions were contrary to or involved an unreasonable application of clearly established federal law or were based on an unreasonable determination of the facts in light of the evidence presented in the state court proceeding. The court will likewise deny a certificate of

42

appealability, as DiValentino has failed to make a substantial showing of the denial of a constitutional right, see 28 U.S.C. § 2253(c)(2), or that "jurists of reason would find it debatable" whether this court's procedural rulings are correct, Slack v. McDaniel, 529 U.S. 473, 484 (2000).  An appropriate Order follows.

Date: _4/6/26_

BY THE COURT:

JUDGE JULIA K. MUNLEY
United States District Court

43